IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


DAVID CARLTON                                                                                    PLAINTIFF


v.                                    Civil No. 05-2034


JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                                            DEFENDANT


## MEMORANDUM OPINION

Plaintiff David Carlton brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration denying his application for disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act.

### Procedural Background:

Carlton filed his application for DIB on December 10, 1998. (Tr. 73-75). He alleged a disability onset date of March 4, 1997, due to back pain, chest pain, right knee pain, and emphysema. (Tr. 18, 73-75, 136).

An administrative hearing was held on December 1, 2000. (Tr. 409-425). Carlton's counsel appeared and reported that Carlton was unable to attend due to his return to work as of October 19, 1998. (Tr. 411). Transcripts of testimony Carlton had given in connection with a worker's compensation claim were admitted. (Tr. 178-179). A vocational expert also appeared and testified. (Tr. ). Carlton's counsel requested an award of benefits for a closed period from

-1-

March 4, 1997, the alleged disability onset date, to October 19, 1998, the date Carlton returned to work as a truck driver. (Tr. 17, 19).

By written decision dated January 11, 2001, the administrative law judge (ALJ) found that Carlton was not disabled within the meaning of the Act. (Tr. 14-25). The ALJ first noted Carlton was precluded from seeking benefits prior to March 25, 1998, the day after the decision denying a prior application for benefits. (Tr. 17). The ALJ noted that the reconsideration decision was not appealed and found there was no good cause or other justification for reopening the prior application. (Tr. 17).

The ALJ found that, although severe, Carlton's impairments did not meet or equal the criteria of any of the impairments listed in Appendix I, Subpart P, Regulations No. 4 (Tr. 20). After discrediting Carlton's subjective allegations, the ALJ concluded that he maintained the residual functional capacity (RFC) to engage in medium work with only occasional stooping or crouching and avoiding dust, fumes, and gases. (Tr. 23).

Carlton appealed the decision of the ALJ. (Tr. 10, 12-14). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied Carlton's request for review on January 4, 2005. (Tr. 6-8).

### Evidence Presented:

On May 22, 1992, Carlton was involved in a motor vehicle accident. (Tr. 385). Carlton's left 9th and 10th ribs were fractured. (Tr. 387). He reported neck and lower back pain. (Tr. 385-386). He was followed by Dr. Stevenson Flanigan and Dr. Charles Klapper. (Tr. 391-392). He was estimated to have a permanent partial functional impairment of 10% with reference to the range of movements for his lower back and neck. (Tr. 392).

AO72A
(Rev. 8/82)

On October 23, 1992, an MRI of Carlton's cervical and lumbosacral spine was done. (Tr. 383-384). This showed minimal central bulging of the disc at the C3-C4 level. (Tr. 383). The L3-L4, L4-L5, and L5-S1 intervertebral discs all exhibited some posterior bulging but no evidence of frank herniation. (Tr. 384). The examination was also suspicious for spinal stenosis. (Tr. 384).

On March 31, 1997, Carlton was seen by Dr. Ken Turner. (Tr. 352). According to Dr. Turner's office notes, Carlton reported a history of lumbar disc herniation in the past. (Tr. 352). He reported that about five weeks previously he began having low back pain that radiated into the right leg. (Tr. 352). Carlton had normal knee jerk and ankle jerk reflexes, normal dorsiflexion and extension of both feet, and normal extension and flexion of knee and hip. (Tr. 352). Straight leg raise was positive bilaterally for right low back pain. (Tr. 352). A lumbar spine x-ray showed a little osteoarthritic change in his lower lumbar spine but normal disc heights and normal vertebral bodies. (Tr. 352). No deformities of the back were observed. (Tr. 352). Carlton was put on Lodine and Flexeril. (Tr. 352). Carlton was told to do no stooping and lifting. (Tr. 352).

On April 11, 1997, Carlton was seen by Dr. Turner. (Tr. 350). On examination Carlton had a positive straight leg raise bilaterally at 60 degrees for low back pain that goes to the right low back. (Tr. 350). The pain also went down the right leg to the knee level. (Tr. 350). Carlton had no weakness in the lower extremities. (Tr. 350). Reflexes were ½+ knees and ½+ at the ankles. (Tr. 350).

AO72A
(Rev. 8/82)

On April 18, 1997, Carlton was seen at the Veteran's Administration Hospital. (Tr. 298-299). He reported having a back injury six years ago with a flare up of the injury seven weeks ago. (Tr. 298). A disc herniation at L4-L5 was the diagnostic impression. (Tr. 299).

On June 16, 1997, Carlton underwent a psychological/vocational evaluation by Dr. Douglas A. Stevens, a clinical psychologist. (Tr. 280-281). Carlton reported being in constant pain, in his right hip and down the right leg, going down the back of the right thigh, with the whole lower leg aching, to the top of the foot. (Tr. 280). He reported pain when he bent his neck forward, stayed in one position too long, or did physical activity. (Tr. 280). He reported his neck was tight and ached and he had headaches. (Tr. 280). Carlton estimated that he could sit for forty-five minutes, stand for fifteen minutes, walk one mile on level ground, but slowly, and lift twenty to twenty-five pounds. (Tr. 280).

Carlton reported being frustrated and anxious because he was in debt and having to live with his parents. (Tr. 280). Since he could not care for himself, he reported being irritable, tense, and worried. (Tr. 280). He indicated his sleep was disturbed and his appetite varied. (Tr. 280). He had little energy and stayed tired all the time. (Tr. 280). He stated he liked to read but after about twenty minutes his concentration was gone. (Tr. 280). Carlton felt worthless and it was noted his distress was secondary to his loss of independence and inability to work. (Tr. 280).

On the Wonderlic Personnel Test Carlton's results were average for a man of his age with a tenth-grade education. (Tr. 280). On the Crawford Small Parts Dexterity Test it was noted his manual dexterity was poor, he could not work at a timely pace with his hand, and he could not

-4-

stay in a seated position. (Tr. 281). The MMPI reflected marked preoccupation with his chronic pain and reactive depression. (Tr. 281).

It was concluded that at that time Carlton was vocationally disabled. (Tr. 281). Note was made that Carlton had socially withdrawn into his family's home and was having frequent deficiencies of concentration and persistence that blocked him from completing tasks in a timely manner. (Tr. 281). It was also noted that he had deficiencies of pace, that were constant. (Tr. 281). He was assigned a global assessment of functioning (GAF) of 50.

On June 26, 1997, Dr. Turner noted that Carlton was managing to tolerate the pain on just Flexeril daily. (Tr. 349). On examination Carlton had a positive straight leg raise on the right about 65 to 70 degrees. (Tr. 349).

On August 3, 1997, Carlton completed a supplemental interview outline. (Tr. 84-88). He indicated he had completed the twelfth grade. (Tr. 87).

He indicated he could bathe, dress, shave, and take care of his own hair care needs. (Tr. 84). He could not do laundry, dishes, iron, vacuum/sweep, do home repairs, repair appliances, repair the car, wash the car, mow the lawn, rake leaves, or do garden work because it caused too much pain. (Tr. 84). He was able to take the trash out. (Tr. 84).

He could not shop for groceries or clothes because it involved too much standing and caused more than average pain. (Tr. 84). He indicated he could do the banking and go to the post office. (Tr. 84).

Since his disability began, he did not prepare meals but did make sandwiches and frozen dinners. (Tr. 85). He indicated it took him about thirty minutes to do this which was longer than it took before his disability began. (Tr. 85).

-5-

He can use a check book and count change. (Tr. 85). He can drive for short distances and can walk short distances for exercise. (Tr. 85).

He did not use any assistive devices. (Tr. 85). He stated he spent his time watching television, listening to the radio, reading, and visiting with friends/and relatives. (Tr. 85).

He indicated he suffered from unusual fatigue and had to rest twice or more a day for one to two hours. (Tr. 86). He stated he had lower back pain, hip pain which traveled the full length of his right leg, and headaches. (Tr. 86). He indicated his pain was constant. (Tr. 86). He could not stand, walk, or sit for any period of time without being in pain. (Tr. 86). His pain became worse if he tried to lift or take on any everyday activities. (Tr. 86).

Nothing helped with the pain other than medication. (Tr. 86). Since his disability began he stated he had a high temper, low attention span, and stayed to himself. (Tr. 87). He also indicated his nerves bothered him a lot. (Tr. 88). On an average day, Carlton indicated he slept, sat, stood, ate, walked through the house, and sometimes walked across the field to his parents' house. (Tr. 87).

On September 15, 1997, Dr. Brad Williams, a psychologist, completed a psychiatric review technique from. (Tr. 284-292). It was concluded that Carlton had an affective disorder and somatoform disorder. (Tr. 284). With respect to functional limitations, it was concluded these disorders would result in a slight restriction of his activities of daily living, moderate difficulties in maintaining social functioning, would often result in deficiencies of concentration, persistence, or pace, and would never result in episodes of deterioration or decompensation. (Tr. 291).

-6-

A mental residual functional capacity assessment was also completed. (Tr. 301-304). Carlton was noted to be moderately limited in the following categories: the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to set realistic goals or make plans independently of others. (Tr. 301-302). There were no areas Carlton was markedly limited in. Dr. Williams concluded Carlton was able to "perform work where interpersonal contact is routine but superficial, e.g., grocery checker; complexity of tasks is learned by experiences, several variables, uses judgement with limits; supervision required is little for routine but detailed for non-routine." (Tr. 303).

On September 4, 1997, Carlton had a MRI of his lumbar spine. (Tr. 309). It revealed a large right paracentral disc herniation at L4-L5. (Tr. 309). An associated encroachment on the right lateral recess and right neural forament at L4-L5 was also noted. (Tr. 309). Additionally, there was an indentation and impingement upon the anterior and right paracentral aspect to the thecal sac. (Tr. 309). Mild annuler disc bulging was noted at the L3-L4 disc levels and to a lesser degree at L5-S1. (Tr. 309).

On September 25, 1997, Carlton was seen by Dr. Turner. (Tr. 349). Dr. Turner noted that Carlton's reflexes in the ankles and knees were equal, his strength was good in the lower extremities, he had no weakness, good dorsiflexion of both feet, and he had good extension and flexion of the knee and hip. (Tr. 349).

AO72A
(Rev. 8/82)

Later that day, Carlton was seen at the neurology department of the VA and put on bed rest for two or three weeks. (Tr. 307). He was prescribed Naproxen and Flexaril. (Tr. 307).

On October 17, 1997, Dr. Turner noted Carlton continued to show positive straight leg raise on the right at about 50 degrees. (Tr. 348). Carlton had no weakness of the leg, normal reflexes, normal dorsiflexion of his ankle, extension and flexion of the knee and hip were good. (Tr. 348).

Carlton was seen at the VA on November 6, 1997. (Tr. 306). It was noted he was doing well. (Tr. 306). He was placed on bed rest for another two weeks and his pain medication continued. (Tr. 306).

On December 1, 1997, Dr. Turner noted Carlton continued to have significant radicular symptoms involving the right leg. (Tr. 347). He had a positive straight leg raising test on the right but no weakness. (Tr. 347). In Dr. Turner's opinion Carlton was "disabled from his usual employment for a period of at least 6 months." (Tr. 347).

On January 2, 1998, Carlton was seen by Dr. Turner. (Tr. 346). On examination his straight leg raise was positive for radicular pain into the left leg. (Tr. 346). His reflexes were normal and he had no weakness. (Tr. 346).

On January 30, 1998, Dr. Turner noted that Carlton reported getting better although he was still not getting around real well. (Tr. 346). His examination showed a positive straight leg test at 60 degrees but no muscle weakness and no loss of reflexes. (Tr. 346).

On March 2, 1998, Carlton was seen by Dr. Turner. (Tr. 345). Carlton continued to have back pain that radiated down his right leg. (Tr. 345). His straight leg raise was positive on the right at 45 degrees, knee jerk reflexes only ½ + in the right knee and 1+ in the left knee. (Tr.

-8-

345). Ankle jerks were normal bilaterally. (Tr. 345). His disability was continued through June. (Tr. 345).

On March 5, 1998, Carlton was seen following conservative therapy for three to four weeks. (Tr. 339). He reported the therapy helped a lot but he still had weakness and pain. (Tr. 339).

On March 4, 1998, Dr. Kathryn M. Gale completed a psychiatric review technique from. (Tr. 312-320). It was concluded that Carlton had an affective disorder. (Tr. 312). With respect to functional limitations, it was concluded these disorders would result in a slight restriction of his activities of daily living, slight difficulties in maintaining social functioning, would often result in deficiencies of concentration, persistence, or pace, and would never result in episodes of deterioration or decompensation. (Tr. 319).

A mental residual functional capacity assessment was also completed. (Tr. 321-324). Carlton was noted to be moderately limited in the following categories: the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; and the ability to set realistic goals or make plans independently of others. (Tr. 321-322). There were no areas Carlton was markedly limited in. Dr. Gale concluded Carlton was able to "perform work where interpersonal contact is routine but superficial, e.g., grocery checker; complexity of tasks is learned by experiences, several variables, uses judgement with limits; supervision required is little for routine but detailed for non-routine." (Tr. 323).

AO72A
(Rev. 8/82)

On March 16, 1998, a physical residual functional capacity assessment was completed by Dr. Alice Davidson, a medical consultant. (Tr. 325-332). With respect to exertional limitations, it stated Carlton could occasionally lift or carry fifty pounds; could frequently lift or carry twenty-five pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and his ability to push and pull was unlimited other than as shown for lift and/or carry. (Tr. 326). No postural, manipulative, visual, communicative, or environmental limitations were established. (Tr. 327-329). It was noted that the symptoms were attributable to a medically determinable impairment. (Tr. 330).

On March 17, 1998, Susan Farque, a vocational analyst, concluded Carlton had the capacity to perform a partial range of medium work. (Tr. 130). She concluded he could lift a maximum of fifty pounds and frequently lift and/or carry twenty-five pounds, stand and/or walk a total of six hours in an eight hour day, and sit about six hours in an eight hour day. (Tr. 130). Carlton was restricted to only occasional stooping and crouching. (Tr. 130). Farque concluded Carlton had the mental capacity to perform work where interpersonal contact was only routine but not superficial and performed tasks were no more complex than those learned by experience with several variables and use of judgment within limits. (Tr. 130). Little supervision was required for routine tasks but detailed supervision was required for non-routine tasks. (Tr. 130).

On April 3, 1998, Carlton was seen by Dr. Turner. (Tr. 345). He continued to have some low back pain that radiated into his right leg but was improving. (Tr. 345). He ambulated without limping, his straight leg raise was positive at about 70 degrees on the right and negative on the left. (Tr. 345). Reflexes were about ½ plus bilaterally. (Tr. 345). He had no weakness when he stands up. (Tr. 345). Dr. Turner noted he was improving significantly. (Tr. 345).

-10-

On April 23, 1998, Carlton was seen at the VA complaining of pain in his right lumbar/scaral area into the right lateral aspect of his leg, just past the knee. (Tr. 337). He was able to walk on his toes and heels without difficulty, his reflexes were intact, he denied any numbness or tingling, and he reported an improvement in strength and pain. (Tr. 337-338).

On April 30, 1998, Carlton was seen by Dr. Jacek Malik. (Tr. 336). It was noted Carlton had been having pain in his back and to his right lower extremity. (Tr. 336). If he continued to have symptoms, a right L4/5 partial hemilaminectomy and diskectomy was recommended. (Tr. 336).

On May 6, 1998, Carlton was seen by Dr. Turner. (Tr. 344). Note was made of the fact that he had a positive straight leg raise on the right. (Tr. 344). His reflexes were intact. (Tr. 344). Dr. Turner noted Carlton was beginning to improve. (Tr. 344). His disability was continued through July of 1998. (Tr. 344).

On June 10, 1998, Carlton's deposition was taken in connection with a claim pending before the Arkansas Workers' Compensation Commission. (Tr. 178-232). Carlton testified he was forty-eight years old and living with his parents. (Tr. 180 & 182). He had been married twice to the same woman and had two children, twins, who were now adults. (Tr. 183-184).

He was not taking any medication. (Tr. 182). Carlton testified he graduated high school and had training in carpentry, brick laying, trucking, and logging. (Tr. 184-185). He was in the Army and drove truck and did mechanic work. (Tr. 185-187).

Prior to his injury at Tommy Davidson Trucking, Carlton had never had any psychological or psychiatric treatment or problems. (Tr. 191). Carlton was asked if he was

-11-

having psychological problems now.  (Tr. 191).  He responded: "No.  Irritation.  I don't know if that would be psychological or not."  (Tr. 191).

Carlton was injured in the mid to late eighties when he was working for Mr. Gilmore hauling from a lumber mill.  (Tr. 193).  A pickup pulled out in front of him and caused an automobile accident.  (Tr. 194).

Carlton was treated for cracked rips and he also injured his back–around the middle of his hips.  (Tr. 195).  He had a tight pulling sensation in his back.  (Tr. 195).  His back condition healed up after the accident.  (Tr. 198).

Carlton had no more problems with his back until he injured  it on the job while working for Tommy Davidson Trucking.  (Tr. 199 & 215-216).  He was injured unloading a fifty pound box of chicken from a truck in Ohio on March 4, 1997.  (Tr. 203-205).  His back started burning.  (Tr. 205).  The condition gradually got worse as he unloaded the last fifteen boxes from the truck.  (Tr. 206).  He could feel a muscle pulling in his lower back area–more on the right side than the left.  (Tr. 206).  He didn't have any symptoms in his legs at the time.  (Tr. 207).

Carlton drove back to Arkansas following the injury.  (Tr. 208).  He had to stop a couple of times to lay down.  (Tr. 208).  When he got back to the terminal, his symptoms were getting worse.  (Tr. 208).  He was having sharp, gouging, pains in his back and had to lift his legs and get on his back to ease the pain.  (Tr. 208-209).

Before he got back into Clarksville, Carlton called his brother and asked him to meet him so he could do the driving.  (Tr. 210).  Carlton told his brother, Billy, that he could not make the trip because his back hurt and he could not sit in the seat.  (Tr. 210).  When he got back to Arkansas, he told the company dispatcher about his back injury.  (Tr. 208 & 211).  Carlton and

-12-

his brother then went to New Mexico to deliver a load. (Tr. 211). Carlton spent most of the time in the sleeper and his brother drove. (Tr. 211).

When Carlton got back to the terminal in Russelville, he told the "log book lady" about his back injury. (Tr. 213). He told her he had hurt his back unloading. (Tr. 213). He told the mechanics the same thing. (Tr. 213). The same week, Carlton also told J.D. Wilson that his back was in bad shape and he was going to have to do something about it. (Tr. 214). Carlton told Wilson the injury occurred in Ohio. (Tr. 214).

It was about three weeks after he injured his back before he first got treatment. (Tr. 216). Carlton went to Dr. Turner who prescribed medication and told him to take it easy. (Tr. 217). Carlton went to the VA and had an MRI done and a "stretch test." (Tr. 219). The VA recommended surgery. (Tr. 219). However, Carlton hesitated to have surgery done. (Tr. 220).

Since his injury, Carlton had tried to do some work around the family farm. (Tr. 220). He indicated he tried to stretch some wire on a fence or run a cow back in. (Tr. 220). He testified he doesn't do any heavy lifting. (Tr. 220). He has also checked on the stem and seed quality of the hay to determine if it was time to cut it. (Tr. 221).

He drives a five speed car. (Tr. 222). He does dishes once in awhile and some cooking. (Tr. 222). Occasionally he baby sits his sister's kids, ages five and three. (Tr. 223). He can pick up the three year old who weighs twenty-one pounds. (Tr. 223).

Carlton testified the pain in his right leg goes all the way down to his foot. (Tr. 225). Carlton estimated he might be able to sit for over an hour without having to get up. (Tr. 225). He estimated he could stand less than thirty minutes without having to sit down or move. (Tr. 225). He estimated he could probably lift twenty pounds. (Tr. 226).

-13-

On June 22, 1998, Carlton was seen as an outpatient at the neurosurgery department of the VA in Little Rock. (Tr. 334). It was noted he had no deviations in his gait, he could heel to toe walk well, and his reflexes were intact. (Tr. 334). Carlton was noted to be neurologically stable and he showed no interest in surgery. (Tr. 334).

On October 6, 1998, Carlton was seen by Dr. Turner. (Tr. 343). He came in because he wanted to quit smoking. (Tr. 343). The notes indicate he had been told four years ago he had emphysema. (Tr. 343). Chest x-rays showed severe chronic obstructive pulmonary disease (COPD). (Tr. 3430.

Carlton completed another supplemental interview outline on December 6, 1998. (Tr. 153-157). Carlton indicated he could take care of his own personal care needs and do laundry, mow the lawn, rake some leaves, and do some garden work but no hoeing. (Tr. 153). He stated he had never done dishes, changed the sheets, ironed, vacuumed/swept, taken out the trash, or repaired appliances. (Tr. 153). He also stated he didn't shop or bank. (Tr. 153).

He stated he could drive including unfamiliar routes and could walk for exercise. (Tr. 154). He stated he had pain in his back, hip, and leg. (Tr. 154). How long the pain lasted depended on how exhausted he was. (Tr. 155). Lifting caused him pain. (Tr. 155). Walking slow helped with the pain. (Tr. 155). Carlton was not on any medication. (Tr. 155).

On June 4, 1999, a physical residual functional capacity assessment was completed by Dr. Delbra Caradine, a medical consultant. (Tr. 367-374). With respect to exertional limitations, it stated Carlton could occasionally lift or carry fifty pounds; could frequently lift or carry twenty-five pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and his ability to push and pull was unlimited other

-14-

than as shown for lift and/or carry. (Tr. 368). No postural, manipulative, visual, or communicative limitations were established. (Tr. 369-371). With respect to environmental limitations, it was noted he should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 371). It was noted that the symptoms were attributable to a medically determinable impairment. (Tr. 372).

On June 7, 1999, Pamela Blackmon, a vocational analyst, concluded Carlton had the capacity to perform a full range of medium work. (Tr. 167). She noted he should avoid exposure to excess dust and fumes. (Tr. 167). On August 30, 1999, Susan Farque, stated it was her opinion that Carlton from March of 1997 through the present had the capacity to perform medium work with occasional stooping and crouching. (Tr. 174).

On August 27, 1999, a physical residual functional capacity assessment was completed by Dr. Ronald W. Crow, a medical consultant. (Tr. 375-382). With respect to exertional limitations, it stated Carlton could occasionally lift or carry fifty pounds; could frequently lift or carry twenty-five pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and his ability to push and pull was unlimited other than as shown for lift and/or carry. (Tr. 376). With respect to postural limitations, it indicated Carlton should only occasionally engage in stooping or crouching. (Tr. 377). No manipulative, visual, communicative, or environmental limitations were established. (Tr. 378-379). It was noted that the symptoms were attributable to a medically determinable impairment. (Tr. 380).

On December 1, 2000, a hearing was held before the ALJ. (Tr. 409-425). Carlton had returned to work and did not appear at the hearing. (Tr. 411). His attorney asked that he be awarded a closed period of disability from March 4, 1997, to October 19, 1998. (Tr. 411).

Sara Moore, a vocational expert, testified. (Tr. 413-424). Moore was asked a series of hypothetical questions. In the first, she was asked to assume a claimant who was the same age, education, and vocational background as Carlton and who had a good ability to read, write, and use numbers who had the following restrictions: the person could occasionally lift up to fifty pounds; frequently lift up to twenty-five pounds; stand or walk six hours in an eight hour day; sit six hours in an eight hour day; only occasionally stoop and crouch; and must avoid concentrated exposure to fumes, odors, dust, and gases. (Tr. 416-417).

Moore indicated there were jobs in the regional or national economy such a person could perform. (Tr. 417). She stated that the driving a tractor-trailer would fall within that hypothetical. (Tr. 417). She indicated this occupation was at the medium exertional level as it was customarily performed. (Tr. 417). She also indicated there were other jobs at the medium exertional level such as a forklift operator, material handler, stock clerk, hand packager. (Tr. 418). Moore identified the following jobs at the light exertional level: machine setters and operators, cashier jobs, and assembly and productions jobs (Tr. 419).

Moore was then asked to change the hypothetical to that of a claimant with a tenth grade education and one with poor manual dexterity who could not work at a timely pace with hands, nor stay in a seated position for prolonged periods. (Tr. 423). Additionally, she was asked to add the following: affective disorder and chronic pain that would affect the ability to focus and frequent deficiencies of concentration and persistence that keep him from completing tasks in

-16-

a timely manner. (Tr. 423). It was noted deficiencies of pace were constant. (Tr. 423). With these additional restrictions, Moore testified there were no jobs in the regional or national economy that this person could perform. (Tr. 423).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by

-17-

medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion**:

Carlton contends the ALJ erred in a number of ways. First, he contends the ALJ erred in concluding that he had no severe mental impairment. Carlton argues the ALJ's summary of Carlton's mental impairment as being "irritability" significantly conflicts with the professional opinion of Dr. Stevens. Carlton points out Dr. Stevens' report indicates Carlton has a tendency toward irritation, tenseness and worry, as well as decreased concentration and feelings of worthlessness. Carlton also notes he was assigned a GAF score of 50 by Dr. Stephens. According to the Diagnostic and Statistical Manual (DSM-IV), Carlton points out this score

-18-

reflects serious impairment of the patient's social and occupational function. *See also Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003).

We believe the ALJ carefully considered the report of Dr. Stevens along with all other available evidence regarding Carlton's alleged mental impairment and had valid reasons for discrediting Dr. Stevens' report. Dr. Stevens saw Carlton only once and it was clear from Dr. Stevens' report, as pointed out by the ALJ, that Carlton's emotional problems were situational. This one time examination occurred in June of 1997 many months before the closed period of disability at issue, March 25, 1998, through October 19, 1998. There is no evidence Carlton received any follow-up treatment from Dr. Stevens or any other mental health professional or any type of mental health treatment from his medical doctors.

The ALJ gave careful consideration to Carlton's testimony during his deposition and during the hearing before the Worker's Compensation Commission. During his deposition, Carlton asked if there were problems other than his back that would cause him to be disabled from working, he replied that other than his back he couldn't recall anything. (Tr. 224). Carlton summed up the his mental impairments as irritability. (Tr. 191). In fact, on June 10, 1998, Carlton testified he wasn't having psychological problems–just irritation. (Tr. 191). The records of his treating physicians contain little mention of any mental impairments, the necessity of any treatment for the same, or a referral for treatment for the same.

Second, Carlton contends the ALJ improperly discredited his subjective complaints. Specifically, he contends the ALJ's decision fails to discuss all the *Polaski* factors instead hinging primarily on the ALJ's belief that Carlton's daily activities were inconsistent with a

disabling condition. Carlton argues the ALJ while reciting Carlton's activities failed to note that the activities were limited and done only on a sporadic basis.

In disability determinations, credibility assessments are the province of the ALJ. *Onstead v. Sullivan*, 962 F.2d 803, 805 (8th Cir. 1992). This court will not substitute its judgment for that of the trier of fact, *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996), nor will we disturb the decision of any ALJ who seriously considers, but for good reason explicitly discredits, a claimant's testimony of disabling pain. *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993).

In this case, we believe the ALJ adequately evaluated the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) and conclude there is substantial evidence supporting the ALJ's determination that Carlton's complaints were not fully credible. The ALJ properly considered Carlton's testimony during his deposition and during the hearing before the Worker's Compensation Commission regarding the condition of his back and his daily activities. Carlton testified that his back gradually got better during the year he was off. (Tr. 249). Carlton wasn't sure of the date he got released to return to work but it was still warm weather in the summer or fall. (Tr. 249 & 268). He was actually looking for work before he got a job on October 19, 1998. (Tr. 272).

While he was off work, Carlton testified he worked around the farm. (Tr. 266). He ran fence wire, counted cattle, helped take care of children, and drove a five-speed automobile, (Tr. 266-267). Carlton testified he was taking no medication. (Tr. 182). Moreover, on April 3, 1998, Carlton's doctor noted significant improvement in his condition. (Tr. 345). Additionally, on April 23, 1998, Carlton reported an improvement in strength and pain. (Tr. 337-338).

-20-

The ALJ pointed out inconsistencies between Carlton's treatment records and his testimony and reviewed the medical records. The "ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to contrary." *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002); *Black v. Apfel*, 143 F.3d 383, 388 (8th Cir. 1998)(upholding denial of benefits where no objective medical evidence supported claimant's subjective pain complaints).

Third, Carlton argues the ALJ inaccurately determined his RFC. Carlton argues there is no evidence from a treating or examining medical source which supports the ALJ's finding that Carlton could have done medium exertional work activities during the relevant closed period. Carlton points out Dr. Stevens stated that Carlton's manual dexterity was poor, he could not work at a timely pace, and he could not stay in a seated position. While Dr. Turner, the treating physician did not assess Carlton's functional capacities, it is argued Dr. Turner did state that Carlton was disabled at least through July of 1998. Carlton contends it was error for the ALJ to rely on the assessments of the non-examining agency physicians.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. *Id*. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's

AO72A
(Rev. 8/82)

determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." *Id*.

In the present case, the ALJ carefully reviewed the medical records, plaintiff's subjective complaints, the plaintiff's testimony regarding his daily activities, and the functional limitations set forth by the non-examining physicians. The ALJ carefully explained his reasons for discounting Dr. Turner's characterization of Carlton as disabled and noted that as of April 23, 1998, Carlton could toe to heel walk and straight leg raise testing was negative. (Tr. 21).

The medical evidence does not support a finding of greater functional limitations than those found to exist by the ALJ. In fact, the medical findings do not support any restrictions on Carlton that would be inconsistent with this RFC.

Finally, Carlton argues the ALJ erred because the hypothetical question to the vocational expert was defective. Carlton argues the hypothetical was flawed because it assumed Carlton could perform medium work without medical evidence to support that conclusion, did not make any reference to chronic pain, and omitted the limitations set forth by Dr. Stevens.

We find that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). Accordingly, we find that the vocational expert's testimony constitutes substantial evidence supporting the ALJ's conclusion that plaintiff was not entitled to a closed period of disability from March 25, 1998, through October 19, 1998. *See Pickney*, 96 F.3d at 296

-22-

(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

**Conclusion**:

For the reasons stated, the court finds that the decision of the Commissioner denying benefits to the plaintiff should be affirmed.

Dated this 8th day of March 2006.


/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)